(235 P.3d 503)
No. 102,084

JOHN O. GILMAN, *et al.*, *Appellants/Cross-appellees*, v.
GERARD BLOCKS, *et al.*, *Appellees/Cross-appellants*.

—

Opinion filed July 9, 2010.

*Bruce W. Beye*, of Overland Park, for appellants/cross-appellees.

*Gerard Blocks* and *Sandra E. Ullah*, appellees/cross-appellants pro se.

Before STANDRIDGE, P.J., GREEN and MARQUARDT, JJ.

GREEN, J.: In this declaratory judgment action, we must determine whether a written declaration entered into between two adjoining landowners created an easement or a license for a 15-foot tract of land adjacent to a party pond. The trial court determined that based upon a specific paragraph in the declaration, the landowners intended to create a license and not an easement. Alternatively, the trial court determined that even if an easement had been created, the landscaping done by the servient tenement owners, Gerard Blocks and Sandra Ullah, did not unreasonably obstruct the use of the easement by the dominant tenement owners, John and Nancy Gilman. The trial court further determined that an irrigation or sprinkler system on the 15-foot tract of land did not unreasonably obstruct the easement and, thus, rejected Blocks and Ullah's request that the Gilmans pay for the cost of removing the system.

The Gilmans now appeal from the trial court's ruling that the declaration created a license and not an easement and its ruling that the landscaping done by Blocks and Ullah did not unreasonably obstruct the Gilmans' use of the property. We determine that the plain and unambiguous language of the declaration demonstrates the previous landowners' intent to create an easement over the 15-foot tract of land. Moreover, even if the language in the declaration created an ambiguity as to whether the previous landowners intended to create an easement or a license, we determine that the surrounding circumstances show that the landowners intended to create an easement over the tract in question. In addition, we hold that Blocks and Ullah's landscaping on the 15-foot tract of land unreasonably obstructed the Gilmans' use of the easement. As a result, we reverse the trial court's rulings that the declaration created a license and that Blocks and Ullah were not required to remove the landscaping on the tract in question and we remand for further consideration of the issue of removal of the obstruction created by Blocks and Ullah.

In addition, Blocks and Ullah cross-appeal from the trial court's ruling rejecting Blocks and Ullah's request that the Gilmans pay for the cost of removing the irrigation or sprinkler system, which they allege encroaches on their property. Nevertheless, because Blocks and Ullah failed to present any evidence to the trial court regarding the encroachment of the sprinkler system on their property, we determine that the trial court properly denied their request for a declaratory judgment on this issue. Although Blocks and Ullah contend that their attorney and the Gilmans' attorney had an agreement to litigate this issue separately from the other issues in this case, they never told the trial court of this agreement before the trial occurred in this case. Such conduct amounted to invited error, and Blocks and Ullah cannot now complain that the trial court failed to rule on an issue that they never properly presented to the trial court and never preserved for later consideration. As a result, we affirm the trial court's judgment on Blocks and Ullah's counterclaim regarding the sprinkler system. Accordingly, we affirm in part, reverse in part, and remand on the issue of removal of the obstruction created by Blocks and Ullah.

John and Margaret Nash owned contiguous lots 1, 2, 3, and 4 of certain residential real estate in Johnson County, Kansas. A pond was located on part of lots 2, 3, and 4. Based on the pond's location, part of lot 3's land was on the back side of the pond and could be accessed by land by going around the pond, which meant going onto the property of lot 2 or lot 4.

Apparently, in 1976, the Nashes began negotiating with J & J Development Co., Inc. (J & J Development) regarding the sale of the Nashes' property. On March 3, 1976, the Nashes and J & J Development filed a declaration of record that reserved the benefits and the obligations to maintain the pond on lots 2, 3, and 4 as follows:

"WHEREAS, said three lots have in common a pond and dam for which this declaration is made in order to provide for the ownership and use of such pond and dam, as well as the maintenance thereof;

"NOW, THEREFORE, in consideration of these premises, John E. Nash and Margaret E. Nash, husband and wife, and J & J Development Co., Inc. for themselves and for their heirs, executors, successors and assigns, and for their future grantees, hereby declare that the above described real estate shall be and the same hereby is, subject to the following declaration:

"1. <u>Persons bound</u>. All persons and corporations who now own or shall hereafter acquire any interest in the property subject to this instrument shall be taken to hold and agree and covenant with the owner of said lots, and with their successors and assigns, to conform to and observe these covenants, restrictions and agreements as to the use and maintenance of the pond and dam thereon. The benefits and obligations of this instrument shall run with the land herein described so long as the pond and dam continues to exist.

"2. <u>Use of pond and dam</u>. The pond and dam shall be a party pond and dam, and the owners of each of the lots hereinabove described shall have the right to use the same jointly with each of the other owners. None of the said owners may erect any dock, platform or other structure, or deposit any organic or inorganic article or substance in or upon the pond and/or dam without the consent of all of the other owners.

"3. <u>Contribution to cost</u>. In consideration of these premises, should it become necessary or desirable, in the opinion of the owners of two or more of the aforedescribed lots, to repair or rebuild the whole or any part of the [p]ond and dam, the repairing or rebuilding expense shall be borne equally by the three lot owners. Any such repairing or rebuilding of the pond and dam shall be on the same location and of the same size as the original, and of the same or similar material of the same quality as that used in the original.

"4. <u>Easements</u>. The owners of each of the lots hereinabove described hereby grants to each of the other owners license to enter upon his or its property in order to gain access to the pond and dam by the most direct route, and further grants license to enter upon and use that portion of his or its property which is within fifteen (15) feet of the water's edge."

The Nashes ultimately conveyed lots 1, 2, and 4 to J & J Development by warranty deeds filed in June 1976, November 1977, and July 1976, respectively. The Nashes conveyed lot 3 to Michael and Susan Gangel by warranty deed filed in April 1976. In August 1998, the Gangels conveyed lot 3 to the Gilmans by warranty deed.

Based on the limited appellate record before this court, it appears that J & J Development later conveyed lot 2 to Leo and Carolyn Hovenkamp by warranty deed. The Hovenkamps then conveyed lot 2 to William and Barbara Eidt in September 2001. William Eidt later died, and Barbara Eidt conveyed lot 2 to Blocks and Ullah by warranty deed filed of record in September 2005. The warranty between Eidt and Blocks and Ullah clearly stated that it was "[s]ubject to easements, reservations, restrictions, and covenants, if any, of record." The title report, which was provided to Blocks and Ullah before the conveyance of lot 2, references the declaration filed March 3, 1976, between the Nashes and J & J Development.

J & J Development conveyed lot 4 to Marlin and Marvel Constance by warranty deed in August 1976. The Constances in turn conveyed lot 4 to Kenneth and Bonnie Ellington by warranty deed in August 1979.

Thus, the chain of title for Lots 2, 3, and 4 can be represented as follows:

Lot 2:

Nashes → J & J Development → Hovenkamps → Eidts → Blocks and Ullah

Lot 3:

Nashes → Gangels → Gilmans

Lot 4:

Nashes → J & J Development → Constances → Ellingtons

After Blocks and Ullah bought lot 2, the situation between them and the Gilmans quickly became unpleasant. In September 2007, Blocks and Ullah constructed a berm and did landscaping work to establish a boundary between lot 2 and lot 3. The berm and landscaping work was within the 15-foot area surrounding the party pond. In November 2007, Blocks and Ullah sent the Gilmans a cease and desist letter. Within the letter, Blocks and Ullah told the Gilmans that they had no right to cross Blocks and Ullah's property and that Blocks and Ullah would call the police if they persisted in traveling across the property. Shortly after the Gilmans received the cease and desist letter, Blocks and Ullah put up "No Trespassing" signs pointing directly at the Gilmans' property.

In a certified letter sent in December 2007, the Gilmans' attorney sent Blocks and Ullah the March 1976 declaration filed of record and told them that the Gilmans had the right to use the property that was within 15 feet from the edge of the pond. The Gilmans' attorney further stated that Blocks and Ullah were in violation of the declaration by planting shrubs and bushes to prevent the Gilmans' use of the easement and requested that they remove the landscaping within 30 days. Blocks and Ullah responded with an 11-page letter in which they conceded that the declaration allowed for a 15-foot easement around the pond. In April 2008, the Gilmans sent another letter to Blocks and Ullah requesting removal of the landscaping within the easement surrounding the pond.

In June 2008, the Gilmans filed a declaratory judgment action against Blocks and Ullah. The Gilmans asked that the trial court issue a declaratory judgment finding the existence of an easement; ordering Blocks and Ullah to remove the obstruction to the Gilmans' access; and making any further orders, including costs and attorney fees, as were just and equitable.

Blocks and Ullah filed counterclaims against the Gilmans. Blocks and Ullah asked the trial court for a declaratory judgment that the right to gain access contained in paragraph 4 of the declaration was a license that did not run with the land. Alternatively, Blocks and Ullah asked the trial court to find that if paragraph 4 was intended to create an easement, then the description of the easement was

so vague or undefined as to be unenforceable. Blocks and Ullah further argued that if the trial court determined that an easement existed, then the Gilmans should be required to remove obstructions placed within the easement, which would include a dock and any irrigation-related devices. For their second counterclaim, Blocks and Ullah asked for a judgment against the Gilmans for the cost of the removal of an in-ground sprinkler system on Blocks and Ullah's property and the restoration of their property.

The case proceeded to a bench trial without a case management or pretrial conference. At trial, Ullah acknowledged that the berm and landscaping work were within 15 feet of the water's edge. According to Ullah, when the berm was put in, it was approximately 6 inches from the water's edge. Nevertheless, when the trial occurred, the berm was approximately 18 inches from the water's edge. Ullah testified that the berm was approximately 22 inches high and that there were two trees planted in the berm area. Although Ullah indicated that there were a 48-inch and 57-inch access areas within the berm, she conceded that John Gilman's larger mower could not get through the access areas.

John Gilman testified that the berm and landscaping prevented him from passing through the 15-foot easement with his mower. According to Gilman, Blocks and Ullah had put up a sign that says "Mower across easement" on their property but that path was approximately 25 to 30 feet from the water's edge.

The Gilmans presented testimony from Kenneth Ellington, the owner of lot 4. Ellington testified that he had moved onto lot 4 in September 1979 with the understanding that there was a 15-foot access easement around the perimeter of the pond granted to the property owners of lots 2, 3, and 4. According to Ellington, he had never consented to Blocks and Ullah's construction of the berm and landscaping work, and he objected to the placement of the berm and landscaping within the 15-foot easement.

Ellington further testified that when he moved onto the property in 1979, there was already a dock built on lot 3 and a couple of pumps that provided irrigation to lots 3 and 4. Consistent with Ellington's testimony, John Gilman testified that the dock, irriga-

tion pumps, and irrigation system were already on his property when he purchased it in 1998.

At the conclusion of the trial, the trial court determined that the declaration created a license and not an easement under Kansas law. The court further found that the berm and plantings did not create an unreasonable obstruction and that, even if the declaration created an easement, "there is sufficient room for persons to pass and there is sufficient room for all equipment." Finally, the court held that the irrigation system and dock did not create unreasonable obstructions.

As a result, the trial court entered judgment in favor of Blocks and Ullah on the Gilmans' declaratory judgment action. The trial court entered judgment in favor of the Gilmans on Blocks and Ullah's request for relief regarding the sprinkler system.

### DID THE TRIAL COURT ERR IN DETERMINING THAT THE DECLARATION CREATED A LICENSE?

On appeal, the Gilmans first argue that the trial court erred in determining that the March 1976 declaration created a license instead of an easement in the 15-foot area surrounding the party pond.

The interpretation and legal effect of written instruments are matters of law over which an appellate court exercises unlimited review. *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009). Regardless of the trial court's construction of a written instrument, an appellate court may construe a written instrument and determine its legal effect. *City of Arkansas v. Bruton*, 284 Kan. 815, 828-29, 166 P.3d 992 (2007).

"Generally, if a written instrument has clear language and can be carried out as written, rules of construction are not necessary. [Citation omitted.]" *Bruton*, 284 Kan. at 829. A court must examine all four corners of a written instrument and analyze particular language in consideration of the entire instrument and not with a critical analysis of a single or isolated provision. *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, Syl. ¶ 3, 961 P.2d 1213 (1998); *T.R. Inc. of Ashland v. Brandon*, 32 Kan. App. 2d 649, Syl. ¶ 2, 87 P.3d 331 (2004).

A written instrument is ambiguous, however, when the application of rules of interpretation to the whole fails to ascertain which one of two or more meanings is conveyed by the parties' words. *Central Natural Resources v. Davis Operating Co.*, 288 Kan. 234, 245, 201 P.3d 680 (2009). "The question of whether a written instrument is ambiguous is a question of law subject to de novo review." *Bruton*, 284 Kan. at 829.

*Differences between Easements and Licenses*

In addressing the parties' arguments as to whether the declaration created an easement or a license, we find it helpful to outline the differences between an easement and a license. An easement is a permanent interest in real property and must be created by deed or prescription. *Stanolind Pipe Line Co. v. Ellis*, 142 Kan. 102, 105, 45 P.2d 846 (1935). But see *Railroad Co. v. Railway Co.*, 9 Kan. App. 281, 60 Pac. 541 (1900) (It is not necessary for the creation of an easement that there be an executed, witnessed, acknowledged, and recorded deed; a writing is sufficient.). Moreover, a declaration that is filed of record can create an easement in real property. See *Chancy v. Chancy Lake Homeowners Ass'n, Inc.*, 55 So. 3d 287, 296 (Ala. Civ. App. 2010); *Avery Dev. v. Village by the Sea Condo.*, 567 So. 2d 447, 448 (Fla. Dist. App. 1990) (determining that declaration filed of record created access easement).

On the other hand, a license is a personal privilege to do some act or series of acts upon the land of another without possessing any estate in the land. A license may be created by parol and is generally revocable at the will of the owner of the land in which it is to be enjoyed, by the death of the licensor, by conveyance of the lands to another, or by whatever would deprive the licensee of doing the acts in question or giving permission to others to do them. *Stanolind Pipe Line Co. v. Ellis*, 142 Kan. at 105.

Quoting 2 Tiffany Real Property 1202 (2d ed. 1920), our Supreme Court in *Stanolind* further outlined the distinctions between license and an easement as follows:

" 'In so far as an easement involves, as it ordinarily does, the privilege of doing or not doing a certain class of act on or in connection with another's land, there is a superficial resemblance between an easement and the privilege created by a

license. The distinction between such an easement and a license privilege lies primarily in the fact that the licensee has a privilege and nothing more, while the holder of an easement has not only a privilege but also rights against the members of the community in general, including the owner of the land, that they refrain from interference with the exercise or enjoyment of the privilege.' " 142 Kan. at 105.

## Plain Language of Declaration

Here, in determining that the declaration created a license for the use of the 15-foot area of land surrounding the pond, the trial court looked only to the language of paragraph 4 and focused on the word "license" within that provision:

"The Declaration itself is a contract between these parties. And, as a contract, it is to be interpreted according to the plain meaning of the language that is used. It is not to be interpreted by any rules of interpretation unless it is ambiguous. And the Court finds that this Declaration is not ambiguous. It uses quite plainly and clearly the word license on two occasions in Paragraph 4. *The Court is not to look at other areas of the contract and create an ambiguity when none otherwise exists.*

"So, the Court feels that, under the circumstances of this case, the Court needs to look squarely at the language of Paragraph 4, and specifically of the use of the word 'license' in two separate occasions.

" 'License,' as the Court has quoted from the cases that the Court has directed our attention to, a license does not convey an interest in land and is not assignable. And, as such, it is not an easement as such which can be enforced as aor can be enforced as an estate in land.

"So, the Court finds that Paragraph 4, and the Declaration itself, under the law of our State, creates a license and not an easement." (Emphasis added.)

Inconsistent with the principles of contract interpretation, the trial court isolated the language in paragraph 4 of the declaration to determine the intent of the parties. Nevertheless, as set forth previously, we must examine all four corners of the written instrument and analyze the language of paragraph 4 in consideration of the entire declaration and not with a critical analysis of a single or isolated provision. See *T.R., Inc. of Ashland,* 32 Kan. App. 2d at 653.

Moreover, there is abundant authority that the label given by the parties to the right created (a license or a lease) does not dictate its legal effect. See Bruce & Ely, The Law of Easements & Licenses in Land § 1:5, p. 1-13 (2010); 25 Am. Jur. 2d, Easements and

Licenses § 117, pp. 612-13 ("In making its determination as to whether a transaction is a license or a lease, a court is not bound by characterization of the parties."). Here, the fact that the parties to the declaration specifically used the word "license" twice within paragraph 4 does not definitively establish that the parties intended to create a license.

Bruce & Ely, The Law of Easements & Licenses in Land § 1:5, pp. 1-12 to 1-17, has set forth the following five factors to be considered in ascertaining whether the intent of the parties was to create an easement or a license:

"1. *Manner of creation of right (oral or written)*. The mere granting of a right in writing does not automatically render it an easement. . . . The existence or absence of words that are 'ordinarily used in the conveyances of real estate' is an important factor. The label that the parties give the right, however, does not dictate its legal effect. For example, a right called a lease may in reality be an easement or a license.

"2. *Nature of right created*. The creation of a right to be used in a particular portion of the servient estate indicates that an easement was intended. Likewise, the existence of authority in the holder of the right to maintain or improve the burdened property suggests an easement.

"3. *Duration of right*. A set duration indicates an easement. A grant in perpetuity also indicates an easement. Further, an express provision that the right benefits its holder's successors and assigns supports the conclusion that an easement was intended. Similarly, an easement is indicated if the right expressly binds the servient landowner's successors and assigns. Conversely, the deletion of words of succession may indicate a license. Finding an easement, however, does not depend upon the existence of 'magic words such as "successors and assigns.' "

"4. *Amount of consideration, if any, given for right*. Substantial consideration indicates an easement. In this regard, it is necessary to distinguish consideration given for the right from money expended in reliance upon the right. An 'irrevocable license' may result from expenditures made in reliance on an existing license.

"5. *Reservation of power to revoke right*. An express reservation of the power to cancel, revoke, or terminate the right may be considered to indicate a license. However, a power to terminate in the landowner does not necessarily mean that a license was created. Specifying a power to terminate for a particular reason or in limited circumstances may be seen as inconsistent with the unabridged right to revoke retained by one who grants a license. Moreover, an easement may be expressly subject to termination by the servient owner upon the occurrence of a specified event."

Here, an application of the above five factors to the March 1976 declaration leads to the conclusion that the parties to the declaration intended to create an easement in the 15-foot tract of land surrounding the pond. Specifically, we note that the property right was embodied in a written document that was filed of record. The right was created in a particular portion of the land (the 15-foot tract of land surrounding the pond). Moreover, the holders of the right had the authority to maintain the tract of land subject to the easement ("this declaration is made in order to provide for the ownership and use of such pond and dam, *as well as the maintenance thereof*").

In addition, the March 1976 declaration expressly binds the parties' successors and assigns: "John E. Nash and Margaret E. Nash, husband and wife, and J & J Development Co., Inc. for themselves *and for their heirs, executors, successors and assigns, and for their future grantees*, hereby declare that the above described real estate shall be and the same hereby is, subject to the following declaration . . . ." (Emphasis added.) The parties further ensured that their intent to bind their successors and assigns was clear by including the following provision in the declaration:

"Persons bound. *All persons and corporations who now own or shall hereafter acquire any interest in the property subject to this instrument shall* be taken to hold and agree and covenant with the owner of said lots, *and with their successors and assigns*, to conform to and observe these covenants, restrictions and agreements as to the use and maintenance of the pond thereon." (Emphasis added.)

The parties then included the following language, which further emphasizes their intent that the rights contained in the declaration were not personal to the parties but instead were to run with the land: *"The benefits and obligations of this instrument shall run with the land herein described so long as the pond and dam continues to exist."* (Emphasis added.) Such language binding a landowner's successors and assigns and creating a right that runs with the land is contradictory to the right created by a license. See 25 Am. Jur. 2d, Easements and Licenses § 117, pp. 612-13 ("Generally, a license in respect of real property, since it is a mere personal privilege, cannot be assigned or transferred by the licensee. A license

does not pass with the title to the property, but is only binding between the parties, expiring upon the death of either party.").

In applying the fourth factor to the March 1976 declaration, we note that the only specific recitation of consideration is the phrase "[i]n consideration of these premises." It is apparent from the declaration, however, that the consideration given by each party was the right to enter upon and use the 15-foot tract of land which was part of the party's property. Such consideration would be substantial in light of the fact that each party's property would be burdened by the right granted within the 15-foot tract of land from the water's edge.

Finally, the declaration contains no express reservation of the power to cancel, revoke, or terminate the right in the 15-foot tract of land. In fact, the only express limitation on the right in the 15-foot tract of land surrounding the pond is the continued existence of the pond and dam: "The benefits and obligations of this instrument shall run with the land herein described so long as the pond and dam continues to exist."

Although the March 1976 declaration uses the term "license" within paragraph 4, a reading of the entire document shows that the parties intended to create an easement in the 15-foot tract of land surrounding the party pond. The declaration is a written document, filed of record, that creates rights in neighboring landowners' real property that run with the land and are binding on the landowners' heirs, successors, and assigns. In addressing the particular question before this court, we conclude that the declaration created an easement in the 15-foot tract of land surrounding the pond on lot 2 in favor of the owners of lot 3, which are currently the Gilmans.

### Ambiguity in Declaration

Nevertheless, even if the use of the term "license" within paragraph 4 of the March 1976 declaration created an ambiguity as to whether the parties intended to create a license or an easement, the evidence presented at trial establishes that the parties' intent was to create an easement and not a license.

Where ambiguity or uncertainty of contract is involved in a written instrument, the intention of the parties is not ascertained by resort to literal interpretation, but by considering all language employed, the circumstances existing when the agreement was made, the object sought to be attained, and other circumstances, if any, which tend to clarify the real intention of the parties. *Amoco Production Co. v. Wilson, Inc.*, 266 Kan. 1084, 1088, 976 P.2d 941 (1999). "To determine whether an easement is the intention of the parties, courts will examine the language of the grant, the circumstances surrounding its creation and the property involved, with construction in favor of the grantee." 7 Thompson on Real Property § 60.03(a)(7), p. 485 (2d ed. 2006); see *Lago v. Guerrette*, 592 A.2d 939, 942 (Conn. 1991).

We are required to construe any ambiguities against the party drawing up the March 1976 declaration. See *Berns v. Standish Pipe Line Co.*, 152 Kan. 453, 459, 105 P.2d 893 (1940) (contract granting right to lay pipeline through land was construed against the party drawing up the contract). The parties drawing up the March 1976 declaration who actually granted the right in the 15-foot tract of land surrounding the pond were the previous landowners of lots 2, 3, and 4. Assuming that there was an ambiguity in the declaration, we note that the previous landowners are the ones who created the ambiguity by referring to the right in paragraph 4 as a license but titling it as an easement. "[I]f there was an ambiguity in the terms used [by the drafter of the contract], it must be construed liberally in favor of the other party." 152 Kan. at 459.

As discussed at length previously, the language used by the parties throughout the March 1976 declaration is language that is used in the creation of an easement. The parties made clear that the declaration was to extend to their successors and assigns and that the benefits and obligations of the declaration were to run with the land as long as the pond and dam continued to exist. Such language is contrary to the right created by a license. See 7 Thompson on Real Property § 60.03(a)(7)(iv), p. 493 ("A license is terminable at the will of either party, cannot be assigned, does not pass at death, terminates upon conveyance of the land, is an agreement binding only upon the parties.").

Additionally, the fact that the parties filed the March 1976 declaration of record indicates that the parties intended to create an easement and not a license. An easement is subject to the Statute of Frauds and must be recorded in order to protect oneself from losing one's easement to a bona fide purchaser of the servient tenement. 7 Thompson on Real Property § 60.03(a)(7)(iv) and (8), p. 492-93. On the other hand, there is no written or recording requirement for licenses and, thus, they are often oral and created by parol. See *Stanolind Pipe Line Co. v. Ellis*, 142 Kan. at 105.

Further, the location of the party pond on the three tracts of land indicated that the parties had intended to create an easement by the 1976 declaration. Based on the location of the pond on lots 2, 3, and 4, lot 3's land was separated by the pond. The owners of lot 3 (now Gilmans) would be able to access their property on the back side of the pond if they were allowed to go around the pond, requiring access onto a small portion of either lot 2 or 4. If the owners of lot 3 were not allowed to go onto lot 2 or 4, it would be extremely difficult, if not impossible, for the owners of lot 3 to access and maintain their land on the back side of the pond. Moreover, because it was a party pond, the owners of lots 2, 3, and 4 would conceivably need access to a limited land area around the pond in order to deal with maintenance issues concerning the pond and dam. In fact, under paragraph 3 of the declaration, the grant of the easement gave the right "to repair or rebuild the whole or any part of the [p]ond and dam" if the owners of two or more of the previously mentioned lots agreed.

Finally, the testimony of Kenneth Ellington, who was the owner of lot 4 and not a party to the proceedings, established that his understanding was that there was an easement in the 15-foot tract of land surrounding the pond. Ellington, who had been the owner of lot 4 since August 1979, testified that he was "told that there was an easement" when he moved to the property. He further testified as to his understanding of the easement as follows: "Well, each party that was connected to the pond could have access to all the way around the pond for 15-foot easement."

Based on the evidence presented to the trial court, we determine that the previous landowner parties' intent, as shown in the lan-

guage of the declaration and the circumstances surrounding its creation, was to create an easement in the 15-foot tract of land surrounding the party pond.

### Unreasonable Interference with Use of Easement

The question now turns to whether Blocks and Ulla's construction of the berm and landscaping work within the 15-foot easement unreasonably interfered with the Gilmans' use of the easement. "It is well settled that the owner of the servient tenement may use the land over which the way extends in any manner which does not [un]reasonably interfere with its use. (*Potter v. Northern Natural Gas Co.*, 201 Kan. 528, 441 P.2d 802 [1968]; 25 Am. Jur. 2d, Easements and Licenses § 89, p. 494; 28 C.J.S. Easements § 91, pp. 770-71)." *Aladdin Petroleum Corporation. v. Gold Crown Properties, Inc.*, 221 Kan. 579, 586, 561 P.2d 818 (1977).

In this case, we have determined that there is an easement created by declaration, which in express terms gives the owners of lots 2, 3, and 4 the privilege of entering upon each other's property in order to gain access to the pond and dam and "for the ownership and use of such pond and dam, as well as the maintenance thereof" "which is within fifteen (15) feet of the water's edge." When one has such an affirmative appurtenant easement, as have the owners of lots 2, 3, and 4 in this case, such easement carries with it the right to do such affirmative acts on the servient lot as are necessary to the enjoyment of the property. See Bruce & Ely, The Law of Easements & Licenses in Land § 8:3, pp. 8-12 to 8-13 ("[T]he parties are deemed to have contemplated the easement holder's right to do whatever is reasonably convenient or necessary in order to enjoy fully the purposes for which the easement was granted."). This right includes the right to repair, maintain, and improve the pond and dam and to enter upon and use the property within 15 feet of the water's edge, as set forth in paragraph 4 of the March 1976 declaration.

We recognize that the owners of the servient tenement, lot 2, have the right to make the maximum use of their property as long as such use is not inconsistent with the rights which they have granted to the tenants of the dominant estate (the Gilmans) under

the March 1976 declaration. Nevertheless, the construction of a berm and landscaping work that at times has been within 6 inches of the water's edge cannot be held to be consistent with the rights granted to the tenants of the dominant estate. As tenants of the dominant estate, the Gilmans have the right to repair, maintain, and improve the pond and dam and enter upon and use the property on lot 2 within 15 feet of the water's edge. Although Blocks and Ullah contend that they have provided a path for the Gilmans to use, the exhibits entered at trial show that the Gilmans are unable to get close to the pond in the area where the berm and landscaping is located. Additionally, they must traverse over a berm and through mulch and plantings to access the rest of the easement area on lot 2.

Moreover, Blocks and Ullah admitted that John Gilman must travel around the pond and enter onto either their lot or the Ellingtons' lot in order to maintain the Gilmans' property on the back side of the pond. Ullah conceded, however, that the space between their plantings is not large enough for the Gilmans' mower. The berm and the landscaping work thus unreasonably interfered with the Gilmans' right to maintain and improve the pond and dam. See *Carson v. Elliott*, 111 Idaho 889, 891, 728 P.2d 778 (1986) (raised garden placed by landowner in circular area of driveway unreasonably interfered with easement because it occasionally interfered with operation of vehicles). As a result, Blocks and Ullah, as the servient tenants of lot 2, are subject to the expense of removing the obstruction that unreasonably interferes with the use by the Gilmans, the dominant tenants of lot 2, of the easement. See *Potter v. Northern Natural Gas Co.*, 201 Kan. 528, 531, 441 P.2d 802 (1968) ("[T]he dominant tenement easement is not subject to the will of the possessor of the land." As a result, the court construed a pipeline easement to require the servient owner to bear the expense of lowering the pipeline.).

In their appellate brief, the Gilmans have requested that this court remand the case to the trial court for a decision on the issue of the removal of the obstructions. Presumably, the remand would be to address the extent that Blocks and Ullah would be required to remove the obstructions around the pond, especially since the

testimony indicated that the waterline does rise and fall, and to set the timeline for such removal.

We point out that Blocks and Ullah have argued that if an easement does exist, the Gilmans should be required to remove a dock and irrigation system that is on lot 3 within the 15-foot area surrounding the pond. Nevertheless, the testimony at trial established that the dock and irrigation system were already on the property when the Ellingtons moved onto lot 4 in 1979. There is no indication that any objection had been made to the dock and pumps before Blocks and Ullah moved onto lot 2 in 2005, and it is apparent that the previous landowners of lots 2, 3, and 4 had consented to those obvious improvements on the land surrounding the pond, pursuant to paragraph 2 of the March 1976 declaration. As a result, the Gilmans should not be required to remove the dock and irrigation system on lot 3.

## DID THE TRIAL COURT ERR IN DENYING BLOCKS AND ULLAH'S REQUEST FOR DECLARATORY RELIEF WITH RESPECT TO THE SPRINKLER SYSTEM?

Finally, in their cross-appeal, Blocks and Ullah contend that the trial court erred in denying their claim for trespass by the Gilmans' sprinkler system without hearing evidence on the matter. Apparently, the parties had an agreement to litigate the issue regarding the sprinkler system separately from the other issues in the case.

The problem here is that the parties never told the trial court of their agreement before the trial occurred and never requested before trial that the trial court hear Blocks and Ullah's claim regarding the sprinkler system at a separate proceeding. A trial judge, as the presiding officer of a court, has control over the proceedings in a case. The parties do not control the court's calendar. The parties easily could have requested a pretrial or scheduling conference and asked for a bifurcated trial. Their failure to request separate trials amounts to invited error, and we will not require the trial court to hear additional evidence on the issue of the sprinkler system. See *Butler County R.W.D. No. 8 v. Yates*, 275 Kan. 291, 296, 64 P.3d 357 (2003) ("A party may not invite error and then complain of that error on appeal. [Citation omitted.]"); *Catholic Housing Serv-*

*ices, Inc. v. State Dept. of SRS*, 256 Kan. 470, 476, 886 P.2d 835 (1994) (extending the invited error rule to encompass procedural problems caused by movant in administrative proceedings).

Based on the evidence presented at trial, we determine that the trial court properly granted judgment in favor of the Gilmans on Blocks and Ullah's counterclaim.

Affirmed in part, reversed in part, and remanded on the issue of removal of the obstructions on lot 2.