No. 70,905

CATHOLIC HOUSING SERVICES, INC., d/b/a ST. JOSEPH CARE CENTER, *Appellant*, v. STATE OF KANSAS DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES, *Appellee.*

(886 P.2d 835)

Opinion filed December 9, 1994.

*Jeffrey A. Chanay*, of Entz & Chanay, of Topeka, argued the cause and was on the brief for appellant.

*Bruce A. Roby*, of Kansas Department of Social and Rehabilitation Services, argued the cause and was on the briefs for appellee.

*Marta Fisher Linenberger*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, was on the *amicus curiae* brief for Kansas Association of Homes for the Aging, Inc.

The opinion of the court was delivered by

MCFARLAND, J.: This is an appeal by Catholic Housing Services, Inc., d/b/a St. Joseph Care Center, (St. Joseph) from its fiscal year 1993 Medicaid reimbursement rate set by the Department of Social and Rehabilitation Services (SRS). The district court affirmed the action of SRS, and St. Joseph appeals therefrom.

For its first issue, St. Joseph contends the district court failed to apply the Act for Judicial Review and Civil Enforcement of Agency Actions (Act), K.S.A. 77-601 *et seq.*

To understand this issue, the procedural history underlying the case must be set forth in considerable detail.

The FY 1992 Medicaid reimbursement rate for St. Joseph was $73.09 per patient day. On July 20, 1992, St. Joseph received notification from SRS that the daily rate for FY 1993 would be $69.48—a $3.61 per day reduction. Instead of invoking the agency appeal procedure, St. Joseph requested a meeting directly with Secretary Whiteman. The request was granted and the informal meeting took place on July 29, 1992. St. Joseph complained the new rate was inadequate and submitted documents in support thereof. Secretary Whiteman agreed to have the material reviewed by her staff and to order an audit to determine the adequacy of the reimbursement rate. As a result of the audit, the rate was increased by staff to $70.42 per day.

On November 5, 1992, Secretary Whiteman advised St. Joseph of her decision on the matter. The letter stated:

"Mr. Jerry Ney, CEG/Administrator
"St. Joseph Care Center
"759 Vermont Street
"Kansas City, Kansas 66101
"Re: Medicaid Rates
"Dear Mr. Ney:

"This letter is notification of the medicaid rates I am approving for St. Joseph Care Center. I have received the administrative review decisions by Mary Hoover, Director of Audit Services, following the field audit of your calendar year end 1991 cost report. This cost report was used to set the payment rate, effective July 1, 1992. *The rates I am approving are $70.60 from July 1 through August 31, 1992, and $71.05 starting on September 1, 1992.* These rates were determined by the auditors in accordance with the Medicaid State Plan. Both rates represent an increase over the original rate approved for July 1, 1992.

"Staff have met with me to review the costs being incurred to operate your facility. The fact that nursing facility services are being provided in an old six floor hospital has resulted in certain inefficient operations. Examples of inefficiencies include the higher food service costs incurred because there is no central dining area for all residents; higher health care costs incurred because a nurse's station must be operated and staffed on every resident floor, rather than only needing one or two stations as in the more modern single level homes; and, higher plant operating costs incurred in heating, cooling and maintaining the six floors. In addition there is a need for a staffed security desk 24 hours per day due to the geographic location of the home.

"The Kansas Medicaid State Plan only allows the facilities with 200 beds or more to exceed the upper payment limit in the Health Care cost center. Other

costs incurred in operating your unique facility may not be reimbursed due to cost center limits. The one cost center which exceeds the upper payment limit which has controllable costs is administration. The following are some notes from our review of the administrative costs.

"1) There are 12 administrative staff with a related payroll cost in excess of $360,000. The positions and salaries are:

| Position: | Salary: |
|---|---|
| Administrator | $ 62,924 |
| Associate Administrator | 31,370 |
| Personnel Clerk | 5,660 |
| Personnel Clerk | 23,553 |
| Office Manager | 25,606 |
| Controller | 61,118 |
| 2 Accounting Clerks | 25,963 |
| Executive Secretary | 16,914 |
| Data Entry Clerk | 16,730 |
| Receptionist° | 18,836 |
| Relief Receptionist° | 1,938 |
| Total Salaries | $290,612 |

°These salaries are for Sisters and are paid to the Mother House.

"2) The salaries of the administrator and controller account for approximately 43% of the total salaries. The auditors moved the salary of the associate administrator to other cost centers where job duties were performed which had a positive impact on reimbursement. An effort should be made to eliminate any unnecessary administrative staff.

"3) Another significant administrative cost is interest expense on operating loans. The auditors found six loans from the Archdiocese with an unpaid balance of $946,828. The 1991 interest payment on these loans was $88,240. There is another large operating loan from Commercial National Bank with an unpaid balance of $530,738 and interest expense of $48,978 for 1991. You will continue to report unusually high interest expense for operating loans until these balances can be paid off. It is recommended that a plan be developed for retiring the operating loans.

"We realize that 80% of your residents are funded by Medicaid. However, a review of all of our nursing facilities found that 28 facilities had the same or a larger percentage of Medicaid residents as St. Joseph Care Center. Three of these facilities were in Kansas City, Kansas. This makes it difficult to justify a rate exception based on the percentage of Medicaid residents in your facility.

"Although we appreciate the services St. Joseph Care Center provides the Medicaid residents in the Kansas City area, it is still difficult to make exceptions when determining the Medicaid payment rate. Many other nursing facilities more efficiently provide services in other difficult situations and surroundings.

Hopefully, you will understand any special reimbursement treatment given to your facility will set a precedent and could be requested by approximately 400 other nursing facilities in the state. We have already created a special level of care in that we do not hold the facilities with 200 or more beds to the upper payment limit for health care. We are asking the four providers in this special level to stay within the upper payment limits for administration, property, and the room and board costs.

"Your assistance towards becoming an economic and efficient operation is appreciated. Hopefully, with further efforts you can achieve such levels. Please let me know if you have questions.

> "Sincerely,
>
> "/s/ Donna L. Whiteman
> "Donna L. Whiteman
>
> "Secretary"

Thereafter, St. Joseph sought to have the rates set by Secretary Whiteman reviewed through the regular SRS review process. This created an immediate problem. The initial rate setting (July 20, 1992) had been done on the lowest rung of the SRS ladder. By skipping the regular review procedure and going directly to the top rung (Secretary Whiteman), meaningful intermediate review was thwarted as the final decision had already been made by Secretary Whiteman. The intermediate review steps hence were a nullity as those who would conduct them had no authority to modify Whiteman's decision.

After some further ineffectual procedural maneuvers at the agency level, St. Joseph filed a petition in the district court for judicial review of Secretary Whiteman's decision.

K.S.A. 77-620 provides:

"(a) Within 30 days after service of the petition for judicial review, or within further time allowed by the court or by other provision of law, the agency shall transmit to the court the original or a certified copy of the agency record for judicial review of the agency action, consisting of any agency documents expressing the agency action, other documents identified by the agency as having been considered by it before its action and used as a basis for its action and any other material required by law as the agency record for the type of agency action at issue, subject to the provisions of this section.

"(b) If part of the record has been preserved without a transcript, the agency shall prepare a transcript for inclusion in the record transmitted to the court, except for portions that the parties stipulate to omit in accordance with sub-

section (c). Unless otherwise ordered by the court, the cost of the preparation of the transcript shall be paid by the appellant.

"(c) By stipulation of all parties to the judicial review proceedings, the record may be shortened, summarized or organized.

"(d) The court may tax the cost of preparing transcripts and copies for the record against a party who unreasonably refuses to stipulate to shorten, summarize or organize the record.

"(e) Additions to the record pursuant to K.S.A. 77-619 shall be made as ordered by the court.

"(f) The court may require or permit subsequent corrections or additions to the record."

Almost immediately after filing its petition for judicial review, St. Joseph began complaining that SRS was not in compliance with K.S.A. 77-620(a) as the agency did not submit the required agency record. The problem lay in the special treatment St. Joseph had sought and obtained. Had St. Joseph gone through regular agency procedure, a full record would have been available. By St. Joseph's having gone directly to Secretary Whiteman for relief, there existed no record as contemplated by the statute. In the district court, the parties agreed "no suitable record is available nor practically procedurally obtainable under original proceedings under K.S.A. 77-620" and that a remand would be appropriate.

The specified issues on remand were:

"A. Whether the petitioner is entitled to the filing of a projected cost report due to its disproportionate share of Medicaid residents and the critical effect that this type of reimbursement has on the day to day cash flow of the facility.

"B. The reallocation of the Associate Administrator's salary and benefits from the Administrative cost center to the Room and Board cost center.

"C. The appropriate methodology for determining the allocation of petitioner's independent boarder offsets.

"D. Whether petitioner's nursing facility is an efficiently and economically operated facility."

At the time of the hearings conducted on May 26-27, 1993, pursuant to the remand order, the issues on remand had been reduced to two issues, as shown by the following:

"MR. CHANAY [St. Joseph attorney]: From our standpoint, we're here today just to present additional evidence on two issues that we believe had not been adequately addressed in the administrative record prior to the time that St. Jo-

seph Care Center took its appeal to the Shawnee County District Court. We're going to be presenting evidence and testimony today on two issues.

"The first one is whether or not the Department of SRS utilized the appropriate methodology for determining the allocation of the petitioner's independent boarder offsets. And then the second issue that we're going to be presenting evidence and testimony on today is the question of whether petitioner's nursing facility is an efficiently and economically operated facility.

"With those two issues, we believe that the administrative record will be complete and that the district court can then enter a decision on St. Joseph Care Center's appeal based upon what we believe are going to be the totality of the evidence. And then the district court can then make the appropriate determination as to whether or not the decision setting St. Joseph Care Center's Medicaid reimbursement rates for fiscal year 1993 are reasonable and adequate and in compliance with federal law and state law. Those would be our only comments at this time."

Transcripts of the hearings and exhibits submitted were subsequently certified to the district court.

The remand did not really accomplish much. The subject of judicial review was Secretary Whiteman's decision. Whiteman did not participate in the hearing. Specifically what documents Whiteman considered in making her decision was not covered on remand.

From these circumstances, St. Joseph argues that had the district court properly applied the Act it would have had no alternative but to rule in St. Joseph's favor because:

1. SRS had failed to produce the record required by K.S.A. 77-620 from which the court could have reviewed the Secretary's action; and

2. the absence of the record renders the Secretary's action to be, per se, arbitrary and capricious.

We do not agree. As will be discussed in greater detail later in this opinion, St. Joseph had been the subject of special treatment by SRS for several years. To accommodate what SRS agreed were St. Joseph's special circumstances, SRS removed St. Joseph from the regular reimbursement plan and created a special class for it, designated as being for facilities over 200 beds. When St. Joseph received the notice fixing its FY 1993 reimbursement rates it, again, sought and received special treatment—meeting directly

with the head of the agency rather than following the agency review process. It is this fact which created the complained-of deficiencies in the record.

It would be wholly inappropriate to permit one who creates a procedural problem at the agency level to gain advantage thereby on judicial review. This is a logical extension of the well-established invited error rule. As we held in *Cott v. Peppermint Twist Mgt. Co.*, 253 Kan. 452, Syl. ¶ 3, 856 P.2d 906 (1993): "On appellate review, a party may not complain of rulings or matters to which it has consented or take advantage of error that it invited or in which it participated."

Further, the record available was adequate for judicial review of the limited issues raised.

We find no merit in this issue.

For its next issue, St. Joseph contends the district court erred in taking judicial notice of another district court case. In its memorandum opinion, the district court stated:

"Before proceeding further with this opinion, *the Court takes judicial notice* of the Memorandum Opinion and Order for Judgment of the Honorable Franklin R. Theis in the case of *Americare Properties, Inc., et al., v. Robert Harder, as Acting Secretary of S.R.S.*, Shawnee County District Court case number 87-CV-117, filed June 21, 1991. This decision, in great detail, reviews the process utilized by S.R.S. in development of the Medicaid reimbursement rates for nursing homes in Kansas and contains a thorough discussion of how the cost reports filed by each facility are arrayed and percentile limits applied to each cost center to establish a maximum reimbursement rate for the four cost centers. Although the historical record and methodology used to establish reimbursement rates through 1986 was not before the Court, Judge Theis found that the lack of this record does not render the established procedures unlawful and found the Kansas Medicaid State Plan to be in substantial compliance with the Medicaid Act. Judge Theis affirmed the historical process, although holding the across the board cuts made due to budget constraints were arbitrary and capricious. *This Court adopts and follows the Americare decision in this regard, e.g.,* that the individual cost reports and how the percentile limitation is calculated to establish the cost center limits, may be used as a point of beginning for the Court to consider the rate for reimbursement of a particular nursing home without having the complete files of S.R.S. before the Court." (Emphasis supplied.)

K.S.A. 60-409 provides:

"(a) Judicial notice shall be taken without request by a party, of the common law, constitutions and public statutes in force in every state, territory and ju-

risdiction of the United States, and of such specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute.

"(b) Judicial notice may be taken without request by a party, of (1) private acts and resolutions of the Congress of the United States and of the legislature of this state, and duly enacted ordinances and duly published regulations of governmental subdivisions or agencies of this state, and (2) the laws of foreign countries and (3) such facts as are so generally known or of such common notoriety within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute, and (4) specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy.

"(c) Judicial notice shall be taken of each matter specified in subsection (b) of this section if a party requests it and (1) furnishes the judge sufficient information to enable him or her properly to comply with the request and (2) has given each adverse party such notice as the judge may require to enable the adverse party to prepare to meet the request."

Also relevant is K.S.A. 60-410, which provides:

"(a) The judge shall afford each party reasonable opportunity to present to him or her information relevant to the propriety of taking judicial notice of a matter or to the tenor of the matter to be noticed.

"(b) In determining the propriety of taking judicial notice of a matter or the tenor thereof, (1) the judge may consult and use any source of pertinent information, whether or not furnished by a party; and (2) no exclusionary rule except a valid claim of privilege shall apply.

"(c) If the information possessed by or readily available to the judge, whether or not furnished by the parties, fails to convince the judge that a matter falls clearly within K.S.A. 60-409, or if it is insufficient to enable him or her to notice the matter judicially, he or she shall decline to take judicial notice thereof.

"(d) In any event the determination either by judicial notice or from evidence of the applicability and the tenor of any matter of common law, constitutional law, or of any statute, private act, resolution, ordinance or regulation falling within K.S.A. 60-409, shall be a matter for the judge and not for the jury."

In *Jones v. Bordman*, 243 Kan. 444, 759 P.2d 953 (1988), the district court excluded an expert witness from testifying partially on the basis of factual findings made by a different judge in another district court case (*Barnett v. Drees*). To do this, the *Jones* court took judicial notice of the findings of fact in *Barnett*. As to the propriety of this utilization of judicial notice, we held:

"The final issue raised by the defendants is whether the district court erred in taking judicial notice of the findings in *Barnett v. Drees*. While the district

court might properly, based upon the evidence before it, permit Dr. Lichtor to testify subject to orders limiting his testimony to matters within the scope of his expertise, the issue remains whether the district court in the present case had the ability to take judicial notice of the findings of the district court in *Barnett v. Drees*.

"The scope of judicial notice is defined by K.S.A. 60-409. Nothing within the statute authorizes a court to take judicial notice of the contested factual findings reached by another court. While a court may take judicial notice of the outcome of another proceeding, where that ultimate outcome possesses an independent legal significance (see *State v. Lowe*, 238 Kan. 755, 715 P.2d 404 [1986]), there is no authority for a trial court to take judicial notice of the factual conclusions reached in another court in another case." 243 Kan. at 459.

Here, the purpose of the previously cited "judicial notice" paragraph is uncertain. As the district court took "judicial notice" *sua sponte*, the parties do not have any knowledge independent of the memorandum opinion as to what the purpose was. Judicial notice is a rule of evidence. After stating the court is taking judicial notice of the *Americare* case, the court then states it "adopts and follows the *Americare* decision in this regard." This is wholly distinct from taking judicial notice of an evidentiary matter. There is no specificity as to what portion of the *Americare* opinion is involved.

The *Americare* case was a class action challenging the entire Medicaid reimbursement system for adult care homes involving the time period January 1, 1987, through June 30, 1987. The case herein involves narrow specific questions on limited aspects of the setting of the reimbursement rate for FY 1993 allowed for one care home. SRS allowed $71.05 per patient day, whereas St. Joseph sought a $74.43 rate. The only similarity between that case and the one before us is that they both involve the general subject of Medicaid reimbursement of care homes.

Clearly, this was a misapplication of judicial notice and, in view of the "adopts and follows" language later in the paragraph, must be considered an unfortunate misnomer for what the district court was actually doing. There is some indication in the district court's language that it was pulling *Americare* into this case for its in-depth discussion of the whole Medicaid reimbursement system, its history, and its general operation. If this were the purpose, to

short-cut recitation of undisputed background information, the district court could have just adopted and incorporated a specified portion of the other opinion. This it did not do. It appears to be using *Americare* as the basis for an evidentiary ruling that the SRS record does not have to be so complete as to permit the court independently to calculate the entire complained-of FY 1993 reimbursement rate set for St. Joseph rather than consider only the particular area of dispute.

Without additional speculation on the purpose of the complained-of "judicial notice" paragraph, we will conclude that bringing the *Americare* case into this case was erroneous. St. Joseph complains vociferously of this error but does not show how it was prejudiced thereby. The district court discussed the specific issues relative to the merits of the case and decided them. There is no showing of how the matter of *Americare* affected the outcome of this case. Clearly, no reversible error has been shown relative to this issue. SRS contends, in essence, that in this and the previous issue St. Joseph has attempted to whip up a thick irrelevant froth in order to obfuscate the two narrow and rather simple issues raised relative to the merits. We tend to agree.

We turn now to the merits.

As SRS points out in its brief, St. Joseph takes issue with the rate allowed in only limited respects. Complaint first is made over the allocation of costs to 13 boarders who reside in the facilities. These individuals are retired nuns and priests. They do not live in one area of the facility but are scattered throughout the structure. The cost allocation arrangement had been in effect by agreement for several years. St. Joseph argues this arrangement is no longer appropriate as, when it was established, there were more of such individuals residing in the facility. St. Joseph wanted the amount of revenue received by it for keeping these boarders to be considered the appropriate cost allocation for them. The district court held:

"As to the boarder costs, the Secretary's decision is based upon an agreed historical procedure for excluding boarding costs from Petitioner's expenses of providing nursing home care. At the hearing, Petitioner presented data attempting to justify adding back $55,222 of expenses ($0.98 per patient day) that was dis-

allowed by the Secretary. The basis for Petitioner's argument is that the offset should be the amount of revenue received for the boarder program, which of course is an amount set by the Petitioner. However, the relevance of this adjustment is not established by any reliable evidence. The Petitioner has no in-depth cost analysis to determine its actual boarder costs. Perhaps the boarder program has changed to the point that a new approach should be taken in calculating this expense. However, the Secretary has not deviated from using the procedure agreed upon to calculate these costs about ten years ago. In the event that the Petitioner seeks to change the status quo in this regard, it must come forward with a reliable cost analysis.

"It appears to the Court that Petitioner's proposal for calculating boarder costs is as arbitrary as it claims the Secretary's to be. There is no evidence that the revenues are equivalent to its actual costs for the boarder program. Since the boarders are disbursed throughout the facility and not isolated to a special area, presumably at least some of those beds could be filled with Medicaid or private nursing care patients and Petitioner would be reimbursed at over $71.05 per patient day. The Secretary's disallowance is roughly equivalent to the potential income from just two nursing care patients for one year. If the potential revenues Petitioner forgoes to maintain the boarder program for retired priests and nuns were imputed as income to the facility, application of K.A.R. 30-10-23(c) would penalize Petitioner even more than the Secretary did for the boarder program, by a substantial amount. Under the facts, the Court does not find the Secretary's decision as to the boarder costs to be arbitrary or unreasonable."

We find no error in this determination as it is supported by substantial competent evidence.

Next, we get into the area of whether the facility was an efficiently and economically operated facility. St. Joseph contends it is a unique facility efficiently and economically operated and is entitled to full reimbursement of its actual costs.

The reason to explore a hospital or nursing facility's "uniqueness" is mandated by Medicaid law. Medicaid does not require the reimbursement of actual costs. Rather, it mandates the reimbursement on a "reasonable cost basis" at rates "that are reasonable and adequate" to meet the incurred costs by efficient and economically operated facilities. 42 U.S.C. § 1396a(a)(13)(A) (1988) (the Boren Amendment). However, when the Omnibus Budget Reconciliation Act (OBRA) of 1981 extended the Boren Amendment's reimbursement standard to hospitals, the 1981 OBRA drafters " 'contemplated that the rates fixed in compliance with its provisions might not be sufficient to keep every hospital

participating in the Medicaid program'." *Lett v. Magnant*, 965 F.2d 251, 253, 257 (7th Cir. 1992).

At this point, some additional statements relative to the St. Joseph facility are appropriate. St. Joseph operates its long term care facility in a six-story building designed and previously used as a hospital. Patients reside on four floors. The nature of the physical plant requires the operation of more nursing stations than would be required if the building had been designed for its present use. The building also has the drawback of having no central dining area. The design also involves additional labor costs in the handling and storage of supplies. The size and age of the structure result in high heating, cooling, and maintenance costs. Its location requires that 24-hour security be provided. The bills of about 80% of the patients are funded through Medicaid. This is a considerably higher percentage than average and affords the facility less opportunity to make up any shortfall in its Medicaid reimbursement through the billing of privately funded patients. The evidence herein showed that St. Joseph was, in fact, billing its private patients at a lower rate than its Medicaid patients. The facility, located in Kansas City, has to compete with many other facilities for staffing and has, as a result, higher labor costs.

It is clear from its argument, that St. Joseph believes that the "efficient and economically operated facilities" term relates solely to the management of a facility and is inapplicable to consideration of costs attributable solely to an inefficient and uneconomical physical facility with resultant higher operational expenses. No authority is cited for this proposition. If this were a correct statement, it would be inconsistent with the OBRA drafters' contemplation that rates fixed in compliance with its provisions might not be sufficient to keep every hospital participating in the Medicaid program. Inherent in this statement is that more than inefficient management is contemplated.

Secretary Whiteman's decision does not specifically conclude the St. Joseph's facility is not efficiently and uneconomically operated. However, her reference to additional costs incurred by the physical plant's inappropriate design and location shows such was a part of her consideration. She further states, "Many other

nursing facilities more efficiently provide services in other difficult situations and surroundings." She concludes, "Your assistance towards becoming an economic and efficient operation is appreciated." Inherent in that determination is a conclusion the operation is not now an "economic and efficient operation." Also, Secretary Whiteman's decision reflects another concern. St. Joseph's operation is less "special" now than when the new class was created for its benefit. Four facilities are now in the class. Also, the special circumstances of 80% Medicaid patient occupancy is now less special. As the Secretary notes, 28 facilities had the same or higher percentages of Medicaid patients. The Secretary's letter reflects a concern that she has to consider these other facilities before making exceptions for St. Joseph.

St. Joseph's objects to having its costs compared to those of any other nursing homes. In this regard, the district court held:

"Petitioner argues that since MS-92-22 established special class facilities to be reimbursed based upon their unique features, the Secretary erred in considering three of the cost centers established for other nursing homes. Using the three cost centers disallows consideration of part of Petitioner's costs in these areas. In effect, Petitioner argues that it should be reimbursed all of its actual costs because it is a special class facility.

"The 'special class' consists of Petitioner and three other facilities having over 199 beds. Petitioner has 201 beds—just two more than those facilities reimbursed under the formula where all four cost center limits are applicable. If Petitioner's reimbursement rate were calculated under the formula for a 199 bed facility, its reimbursement rate would be $65.94 per patient day. The health care cost center, for which Petitioner's costs were fully allowed, exceed the health care cost center limit by $5.11 and the Kansas Nursing Home Association average cost for health care by $7.16 per patient day.

"A major factor in Petitioner's higher than average costs is its physical facility, a converted six-story hospital building. It cannot centralize its labor intensive services.

"The existence of the special class category does not establish a state policy or any basis to conclude that the costs of providing care in other nursing facilities is not a relevant consideration and measure for determining an economical and efficient provider. Although the terms 'economical and efficiently operated facility' have not been specifically defined in law or regulation, the term itself certainly infers a comparison to the performance and costs of other facilities rendering the same or similar services. This is especially true when Petitioner's home is numerically different by only two beds.

"Petitioner has gone to great lengths to establish that they operate their particular facility in an efficient manner. While the Secretary made no particular finding in that regard, assuming arguendo, that Petitioner's nursing home is operated at the minimum costs achievable for that facility, the Secretary's investigation should not end there. The Secretary is also obliged to determine whether or not the care and services are delivered in an economical and efficient manner. A comparative analysis of the bottom line cost of providing similar care in other facilities is a relevant consideration in determining if the Petitioner's facility is efficiently and economically operated. A facility's uniqueness must also be considered, but those special circumstances cannot be used to justify a reimbursement rate substantially higher than the costs at facilities which can provide the services more efficiently and economically.

"The Boren Amendment does not require the State to pay a price for care that is out of line with the market, nor does it guarantee every nursing facility its actual costs even though that facility is being operated as cheaply as possible. The purpose of the Medicaid Program is to provide financial aid to aged, indigent persons, not to provide a subsidy for old, expensive to operate nursing homes. The Secretary's decision to not reimburse Petitioner for all of its actual costs in the health care cost center considers its uniqueness. The Secretary's decision is not contrary to law nor is it an arbitrary, capricious and unreasonable decision."

We note, also, that Medicaid federal legislation does not define the term "efficient and economically operated facility." Each state must determine in its own way what it would consider efficient and economically operated nursing home facilities. *Illinois Health Care Ass'n v. Bradley*, 983 F.2d 1460 (7th Cir. 1993). A comparison of nursing home operations would seem a logical consideration. The comparison of nursing home operations with their rate of reimbursement of costs in particular areas being determined by in what percentile a particular facility lies is an integral part of the Medicaid plan for Kansas. The allowed reimbursement rate is approximately $20.50 more per day than the average per day rate. Additionally, there is evidence supporting the Secretary's findings of excessive administrative costs.

K.S.A. 77-621 places the burden of proof of the invalidity of an agency action on the party asserting invalidity. The district court concluded St. Joseph had not met its burden of proof. We agree.

The judgment is affirmed.