NOT DESIGNATED FOR PUBLICATION

No. 115,035

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE INTEREST OF N.G.A. and O.G.A.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; ROBB W. RUMSEY, judge. Opinion filed September 16, 2016. Affirmed.

*Jordan E. Kieffer*, of Dugan & Giroux Law, Inc., of Wichita, for appellant mother.

*Erica M. Davis*, of Erica Davis Law, of Wichita, for appellant father.

*Martin W. Bauer* and *Teresa L. Adams*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellees G.S. and B.S.

*Dale F. Kelso*, of Kansas Department for Children and Families, for appellee Kansas Department for Children and Families.

Before LEBEN, P.J., PIERRON and MCANANY, JJ.

*Per Curiam*: The Father and Mother of N.G.A. (the older child) and O.G.A (the younger child) appeal the termination of their parental rights to both of their children. The parents first argue that the district court erred by admitting into evidence several unproven affidavits over the parents' hearsay objections. We agree and disregard the purported facts in the affidavits in considering the merits of the parents' second claim. For that second claim, the parents argue that the State failed to present clear and convincing evidence that they were unfit. The parents ask us to reverse the termination of their parental rights to the children. After reviewing the record on appeal in the light most favorable to the State, as the law requires, and disregarding the information in the

1

affidavits, we hold that clear and convincing evidence supports the district court's finding that Father and Mother are unfit. Accordingly, we affirm the termination of their parental rights.

CINC AND PRE-EVIDENTIARY HEARING TERMINATION PROCEEDINGS

The older child was born prematurely at 27 weeks in January 2012 and placed in the NICU. After mother reported domestic violence to hospital staff, the Kansas Department for Children and Families (DCF) stepped in and, on April 20, 2012, the State petitioned the district court under K.S.A. 2015 Supp. 38-2202 to have this child declared to be a child in need of care (CINC). The State alleged that the child had been physically, mentally, or emotionally abused or neglected; was without the care or control necessary for his physical, mental, or emotional health; and was without adequate parental care, control, or subsistence, and the condition was not due solely to the lack of financial means of the child's parents. See K.S.A. 2015 Supp. 38-2202(d)(1)-(3). The CINC petition was based on concerns about Mother's mental health issues and domestic violence within the home. Mother reported to hospital staff that Father was physically violent to her during her pregnancy, and the State alleged there had been two incidents of domestic violence between Father and Mother since the child's birth.

On April 24, 2012, a temporary custody hearing was held, at which both Mother and Father waived their rights to an evidentiary hearing on the issue of temporary custody. The district court placed the child in DCF's custody, finding that an emergency existed which threatened his safety. When the matter came before the court for adjudication both parents waived their right to an evidentiary hearing. The court found a sufficient factual basis in the petition and found the child to be a CINC. The child remained in DCF custody.

On November 28, 2012, a combined permanency hearing was held. The district court was presented with evidence of the parents' compliance with the reintegration case plan tasks, including: participation in couples' therapy; completion of required budget and nutrition classes; regular supervised visitation facilitated by Youthville; Father's completion of a clinical mental health assessment; Father's completion of an anger management class; and Mother's completion of a counseling intake. Based on the case progress, the district court found that the dispositional case plan goal should remain reintegration.

On February, 2, 2013, a day after leaving Father, Mother gave birth to the younger child, who also was born premature and placed in the NICU. Two days later, Mother filed a protection from abuse petition against Father, but the petition was dismissed after Mother failed to attend a hearing. Mother and Father resumed living together.

On February 27, 2013, the State filed a motion for review and termination with respect to the older child only. Regarding Mother's unfitness, the State asserted, in part: (1) Mother was codependent on Father; (2) Mother was not capable of providing a safe environment for the older child by protecting him from Father's abuse; (3) Mother was mentally ill, including a diagnosis of borderline personality disorder; (4) domestic violence was a problem in the home before the older child's birth and continues to be a problem; (5) Mother was incapable of rehabilitation despite reasonable efforts by DCF services and professionals; and (6) Mother had not adjusted her circumstances to meet the needs of her older child because she often denied the existence of domestic violence in the home and failed to pursue the protection from abuse petition she filed against Father.

Regarding Father's unfitness, the State asserted, in part: (1) Father had an explosive temper and could not provide the older child with a safe, secure, nurturing home environment; (2) Father was physically abusive to Mother; (3) Father was on

3

probation for two convictions of domestic violence; and (4) Father was mentally unstable.

In June 2013, Mother and Father were divorced, but they continued to live together.

On June 14, 2013, DCF filed its amended motion for review and termination. The motion alleged essentially the same bases for termination as the first motion but sought termination of the parents' rights to the younger child as well. The district court found reintegration into Mother's and Father's care was no longer a viable option.

TESTIMONY AT TERMINATION EVIDENTIARY HEARINGS

First, we note that the presence of domestic abuse in the home is undisputed. Both Father and Mother testified and admitted that their relationship included physical domestic abuse.

The evidentiary hearing on the termination of parental rights was conducted over various dates in November and December 2013. Then, in August 2014, the hearing was suspended and the court adopted a reintegration plan in the hope that the matter could be successfully concluded with the return of the children to their parents. But on February 6, 2015, a second amended motion for termination was filed, and the termination hearing resumed in March 2015. Over several days the State presented a number of witnesses, including therapists, psychologists, social workers, friends, and relatives. In addition, both Mother and Father testified at the hearing. Because the issue of the sufficiency of the evidence to support termination is so central to resolution of this appeal, here is a detailed summary of the testimony before the district court.

4

Sydney Walsh, a 4th year doctoral student with a master's degree in psychology, completed a clinical assessment of Father. As part of the assessment, Father acknowledged that he had domestic violence reports in the past, but he denied "physically hitting any of the women that have charged him with domestic violence," including Mother. Father admitted some verbal abuse, but he blamed his temper on his own anxiety and Mother's messiness and laziness. Walsh believed Father minimized his role in the domestic violence issues. Walsh did not make any recommendation on the termination issue, but she opined that children who witness verbal, physical, emotional, or psychological abuse in the home are generally at a higher risk for "maladaptive behavior patterns" and problems.

Nakisha Carrasquillo, a 5th year clinical psychology graduate student, completed a clinical assessment of Mother. Mother reported domestic violence in the home, including physical and emotional abuse. She informed Carrasquillo that Father had kicked her in the stomach, prompting a neighbor to call the police. Carrasquillo reported that Mother had impaired judgment regarding Father and continued to stay in an emotionally abusive relationship. Mother had a pattern of attempting to leave her husband but then returned to him each time. Because Carrasquillo interviewed only Mother, she did not give an opinion as to how the children were affected by domestic violence in the home. But she testified that "it has been shown that a volatile environment, a hostile environment in which there is abuse can lead to or is related to some emotional problems, psychological problems or behavioral problems." According to Mother, the situation at home had escalated since the older child was placed in foster care. Carrasquillo expressed concern about Mother's inability to be alone and her inability to permanently separate herself from the abusive Father.

Dana Rhodes, a registered nurse, met Mother after she assisted her during the older child's birth. Rhodes testified that Mother called her in the late spring of 2013 for

help after an argument with Father. Mother told Rhodes that Father "beat the shit out of me."

Quin Heavrin, a licensed family and marriage therapist who treated Mother, testified that Mother expressed her hope and belief that she could still be with Father and gain custody of her children. At other times, Mother seemed intent on ending her relationship with Father and raising the children with the support of her family. Heavrin recommended that there be no domestic violence in the home for a period of 1 year before she would recommend the placement of the children in the home. Mother reported to Heavrin that there were four incidents of violence or abuse that had occurred around the time of the younger child's birth. Regarding domestic violence in the home, Heavrin opined that children are generally affected by what occurs in the home but trauma affects different people differently, and there is no way to predict how the harm would play out in a child's life. Mother ended her therapy with Heavrin in order to pursue a different therapist who would be supportive of her efforts to gain custody of her children while still living with Father.

Joel Ybarra, a licensed marriage and family therapist, worked with Mother and Father in 24 joint therapy sessions. Mother had reported physical violence. Father initially denied any physical abuse, conceding only that there was a lot of yelling. Mother attended a session in July 2012 with a large bruise on the side of her face which she later said Father caused. As the therapy progressed, Father admitted both verbal and physical abuse of Mother. Ybarra terminated his therapy sessions with Mother and Father because he believed the therapy was no longer beneficial. Ybarra reported that Mother told him there was violence in the home, but she did not want those things discussed with Father present. This created a barrier preventing the couple from reaching the goals of treatment.

Heidi McDonald, an outpatient marriage and family therapist, conducted a court-ordered clinical assessment of Mother in September 2012. McDonald testified that she

thought Mother was minimizing her history of domestic violence with Father. McDonald diagnosed Mother with an anxiety disorder.

Dr. Laura Turner, a clinical psychotherapist, provided individual therapy services to Mother. Mother showed Turner a video which portrayed a heated argument with Father. Turned described the argument as loud and verbally aggressive. Turner believed Mother shared the video with her to show Mother's need to sever her ties with Father. But Mother seemed unable to put her children's needs above her own and provide consistent parenting because she constantly changed her position on whether to leave Father or work out their relationship and gain custody of the children.

Pastor Robert Rotola met Father and Mother after the couple attended his church. On several occasions, Mother called Rotola for pastoral counselling. She talked with Rotola over 50 times on the phone. Rotola estimated that during 10 to 25 of Mother's calls, he heard Father in the background screaming at Mother. Rotola often heard Mother weeping. He described the statements Father made to Mother as volatile and horrible. On about 15 occasions Mother was supposed to come in for counselling but did not.

Mother testified that Father's threats and physical violence had been ongoing for about 2 years and had progressively gotten worse. Mother said that Father had threatened to knock her head off.

Jacob Asbridge, family support worker, supervised approximately 36 visits with each parent. He testified that he was worried about the safety of the children because of Mother's reports of domestic violence in the home and her requests for separate visits with the children. Asbridge reported that Mother sent emails, texts, and called to report the continuing domestic violence in the home. The parents were consistent in their visits with the children and brought appropriate toys, but they tended to be less than fully attentive to the children and did not fully use their parenting skills.

7

Lori Salas, St. Francis Community Service supervisor and former permanency specialist at Youthville, met with Father and Mother on a monthly basis. She testified to the various programs the parents had completed. She described Mother as inconsistent, sometimes reporting domestic violence in the home, and then later denying it. Salas told Mother that as long as domestic violence was occurring in the home, she would not recommend reintegration of the children. Mother told Salas about an incident in which Father pushed her, grabbed her hair, and flung her against a wall. In January 2013, the case plan changed from reintegration to adoption based on continuing allegations of domestic violence. Salas recommended termination of the parents' parental rights because the children would not be safe in a home with domestic violence. She was concerned that this domestic violence in the home would affect the children for the rest of their lives. She described Mother's habit of leaving Father and later returning to the home. Salas testified that the goal was to find a safe environment for the children, but she believed that the environment would not be safe as long as the parents were together. She opined that the children's basic needs could not be met in an environment of domestic abuse. She testified that the older child was developmentally delayed and that the younger child was also receiving services. Salas does not believe it is in the best interests of the children to be placed with their parents.

Audrey Withrow, case manager at St. Francis Community Services, testified that she had no concerns about the parents' parenting skills. Nevertheless, she supported termination because Father and Mother cannot provide a safe environment for the children because of the domestic abuse in the home and Mother is unable or unwilling to separate from Father. Withrow testified that children are affected by violence in the home and can experience developmental delays, regression, neglect, abuse, and extreme separation anxiety. She stated that the children have a need for permanency and to keep the case open would not be in the best interests of the children. The older child was receiving services for his speech, walking, and motor skills. The younger child also has slight developmental delays and is receiving services to address those issues.

Derrick Prichard, marriage and family therapist, provided services to the parents as a couple. He believed the couple had made a decision to stay together. He was unaware that Mother had filed three protection from abuse petitions against Father, but he conceded that domestic violence in the home would have a negative effect on children in the home.

On March 26, 2014, the evidentiary hearing was interrupted when the parties informed the court that the social workers assigned to the case had observed some recent changes in the parents and believed that termination was no longer appropriate. Accordingly, the court continued the matter for 90 days.

At the next review hearing, the court was told that the parents were making substantial progress toward reintegration. The parties discussed a tentative reintegration plan. The plan was adopted by the court on August 14, 2014. The plan called for family reintegration by November 25, 2014.

As the parents approached the reintegration date, Mother filed another petition for protection from abuse order against Father. Mother then left the home in December 2014. As a result, on February 6, 2015, the State filed a second amended motion for termination, asserting that the changes and progress the parents made were "transient and cosmetic" and Mother and Father had since resumed their dysfunctional relationship. An outline of recent explosive and erratic behavior was included in the motion. On March 24, 2015, the termination hearing resumed.

At the resumed hearing Father testified that things had been going very well for him and Mother. In Mother's most recent petition for a protection from abuse order, Mother alleged that Father had tried to cut off her air supply with a blanket. Father denied Mother's allegations. Though the children were present in the home when an incident between the parents occurred, Father contended that the children were in another part of

the house when he and Mother were "screaming and yelling." He noted that Mother had dismissed all three of her petitions for protection from abuse. Mother separated from Father on December 14, 2014, and again on January 21, 2015, the second time supervised by the Park City Police.

Father sought another chance to rear his children with Mother. If that failed, Father testified that he would be willing to separate from Mother in order to provide a home for his children. He noted that the children are very bonded with both parents. Father testified that he did not believe Mother had mental health issues. He thought that his mother-in-law was manipulating Mother and persuading her to leave him.

Amy Meek, family therapist, had assessed Mother and Father. She confirmed that there was bond between the parents and the children. But she was concerned about Father's indecisiveness and his belief that children should be considerate of their parents' needs, not the reverse. She had a similar concern about Mother. She was also concerned about the safety of the children if Father continues to make derogatory comments about Mother when the children are present. Meek was concerned about Mother's blunted affect, symptoms of depression, and borderline or dependent personality traits.

Dr. Turner testified in rebuttal regarding therapy efforts since the last hearing. Turner testified that she recently discontinued therapy with Mother because Mother would change her story "from one week to the next" and it made it impossible to make any progress. Mother stated that Father was abusive but then denied that any abuse happened. Mother had sent Turner emails about Father putting his knee in her back, slapping her, and throwing things at her. Mother cancelled an appointment with Turner because she said she was in the hospital after Father beat her up. However, Mother later changed her story and told Turner that her injuries came from combative patients at her workplace. Mother told Turner that she had returned to live with Father. Turner did not think Mother could stay away from Father. Further, she opined that Mother's pattern of

claiming her relationship with Father was abusive and then claiming she was happy with him is consistent with a Mother being in a co-dependent and abusive relationship. Turner opined that Mother's instability would affect her ability to parent.

Mother admitted filing a protection from abuse petition against Father on December 15, 2014, but she declined to discuss the matter further, relying on the Fifth Amendment constitutional right not to testify against herself. She did, however, state that the children were on an overnight visit with her and Father when the events took place that led her to file the PFA action. She contended the children were in another part of the house during the argument.

Dr. James Dickerson, clinical psychologist/neuropsychologist, conducted a parenting evaluation and psychological evaluation of both Mother and Father in June 2014. Although Mother had previously been diagnosed with borderline personality disorder, Dickerson ruled out that diagnosis at the time because Mother met only three of the nine criteria for a borderline personality disorder diagnosis. But given the events since that evaluation, Dickerson was of the opinion that "we're moving toward a rule in rather than a rule out of borderline personality disorder." Persons with such a disorder often like drama or attention and fluctuate in their feelings. Mother's behavior of leaving the home twice with the children and filing a petition for protection from abuse was consistent with the volatility of someone diagnosed with borderline personality disorder.

Dickerson said that Father had been previously diagnosed with antisocial personality disorder due to his anger and dealings with the child welfare system. Father previously had also been diagnosed with intermittent explosive disorder. Dickerson ruled out both disorders because he did not directly observe any of Father's behaviors. But he testified that he might rule in both disorders if there were multiple instances of explosive outbursts leading to Mother filing protection from abuse petitions or indications that Father had physically and verbally abused Mother. According to Dickerson, it would be

11

inappropriate to have children in the home with a parent who has an intermittent explosive personality disorder.

Prichard, who had testified earlier, testified regarding his therapy sessions with the parents. During the summer the parents seemed to be communicating and getting along well. But the fact that Mother had filed another PFA petition against Father was "an example of some of the ongoing challenges they had with establishing and maintaining stability in the relationship." During their last session in March 2015, the parents admitted that their relationship had its up and downs, but they were still working on those issues.

Philip Ashley, marriage and family therapist, began treating Father in November 2012. Ashley had about 40 sessions with Father over 2 1/2 years. Ashley also had five sessions with Mother. Ashley opined that Father was transparent and honest and could properly exercise his duties as a parent. He recommended that Mother and Father separate because they have not shown that their issues have resolved.

Kristina Young worked as a supervisor at St. Francis Community Services from June 1, 2013, to March 31, 2014. Young worked as a social worker on Mother's and Father's cases, but at the time she testified, she had not worked on their cases for about a year. According to Young, there were never any issues with how Mother and Father exercised their visitation and interacted with the children. Young testified that she believed Father is capable of caring for the children on his own and believed there would be no problem with Mother exercising parenting time. She admitted that she had some concerns about domestic violence. Father had admitted past incidents of physical and emotional abuse, but Father claimed he now handled his anger by going to the basement. Young discussed with Father that the children would be harmed if he were verbally abusive to Mother in front of them.

Young testified that she was pressured by her supervisor to make a recommendation of termination consistent with the position taken by her employer. Shortly thereafter, Young was terminated from her position. She attributed her firing to the stance she took in this case and the interference by the children's maternal grandparents.

Mother testified about the pressure her own mother and family put on her to leave Father. If the court would not allow her and Father to raise their children together, she urged that custody be granted to Father with visitation rights for Mother.

Martha Horn, the current case manager in the case, testified about the cycle of abuse. Mother left Father in December 2014 for about 2 weeks and in January 2015 for about 3 weeks. Mother had sent Horn text messages each time Father verbally or physically abused her, and she included copies of photographs of bodily injuries he had inflicted. Horn said that Mother's story changed every week. According to Horn, the parents' relationship was "controlling" and "codependent"; Mother gets moments of strength when she leaves but then is pulled back to Father. Mother told Horn that they had been fighting in front of the children during overnight visits.

Horn did not think the parents should be given more time for therapy given the length of time the case has been pending and the lack of any change in the cycle of violence. Horn opined that if the parents are given joint custody with Father as the primary custodian, he will use this as another tool to control Mother. Horn did not believe that the parents would be able to stay apart. She recommended termination of parental rights.

13

After considering all the evidence admitted at trial, the district court ruled that the younger child was a CINC and that Mother's and Father's rights to both children should be terminated. The district court found Mother unfit under K.S.A. 2015 Supp. 38-2269(b)(1), (b)(4), (b)(7), (b)(8), and (c)(1). Father was found unfit under K.S.A. 2015 Supp. 38-2269(b)(1), (b)(7), and (b)(8). The district court's findings were primarily based on the concerns about the parents' volatile and unstable relationship. The court held that there was clear and convincing evidence that the finding of unfitness was not likely to change in the foreseeable future and that it was in the children's best interests to terminate parental rights.

Father and Mother appeal.

## DISCUSSION

*Admission of Petitions*

Mother and Father contend that a number of unproven affidavits in the form of PFA and protection from stalking (PFS) petitions were erroneously admitted as evidence over their hearsay objections. The State offered certified copies of these petitions relating to Father's prior relationships. The documents consisted of the following:

- A PFA petition filed by Clarissa Rae against Father;
- A PFS petition filed by Rae against Father;
- A PFS petition filed by Amy Borofsky against Father;
- A PFA petition filed by Elizabeth Ragland against Father.

14

Neither Rae, Borofsky, nor Ragland were present to testify about the matters contained in the petitions. The district court also admitted the PFA petitions by Mother and Father, but those parties were present to testify.

Counsel for both parents objected to the admission of the petitions of Rae, Borofsky, and Ragland on the grounds that the exhibits contained hearsay and were not subject to any applicable hearsay exception and were not subject to judicial notice. Citing *Catholic Housing Services, Inc. v. State Dept. of SRS*, 256 Kan. 470, 886 P.2d 835 (1994), for the proposition that "findings of fact from a case are not admissible" and arguing *a fortiori* that mere allegations in a petition are not admissible, Mother's counsel stated:

> "[J]ust because someone writes something down in a petition . . . what you're doing is having somebody write down the allegations and then put them on a pleading and file them with the court and now they're somehow admissible. I believe that is not permitted by 60-409, in including the facts that can be judicially noticed."

The district court ruled, "Okay. I'll take judicial notice of the exhibits offered by the State, give them the weight appropriate." We have unlimited review of a challenge to the adequacy of the legal basis for the district court's decision to admit or exclude evidence. *State v. Bowen*, 299 Kan. 339, 349, 323 P.3d 853 (2014).

At the outset, we note that the challenged affidavits were not included in the record on appeal. But we can determine from the record the essential substance of the documents to enable us to address the issue on the merits.

K.S.A. 2015 Supp. 60-460 prohibits the admission of out-of-court statements offered to prove the truth of the matter asserted, unless the statements fall within a statutorily designated exception. There is no indication that Rae, Borofsky, or Ragland

15

were available to testify regarding the contents of these documents. They were not admitted merely to undermine Father's credibility, as the intervenor-maternal grandparents argue. The documents were hearsay.

The parents recognize two possible exceptions to the hearsay rule. One exception is for the admission of an affidavit, if using an affidavit in the proceedings is specifically provided for by statute. See K.S.A. 2015 Supp. 60-460(b). A second hearsay exception applies to an authenticated copy of an official record or of an entry therein. See K.S.A. 2015 Supp. 60-460(o). But the district court did not apply an exception to the hearsay rule to admit the documents. The court merely stated it would take judicial notice of them and "give them the weight appropriate." Thus, we need not consider the hearsay exceptions further but will examine the court's basis for taking judicial notice of these documents.

Kansas law recognizes that a district court may take judicial notice of its own records under K.S.A. 60-409. See *Wentland v. Uhlarik*, 37 Kan. App. 2d 734, 739, 159 P.3d 1035 (2007). In addition, a district court "may take judicial notice of the outcome of another proceeding, where that ultimate outcome possesses an independent legal significance." *Jones v. Bordman*, 243 Kan. 444, 459, 759 P.2d 953 (1988). But here, the petitions did not contain an "ultimate outcome" possessing independent legal significance. The documents contain only unproven allegations asserted at the outset of those proceedings. We find no authority for a district court to take judicial notice of factual assertions in another court in another case. 243 Kan. at 459.

It was error for the district court to take judicial notice of these petitions. But the error was harmless. See K.S.A. 2015 Supp. 60-261. We see no indication that the district court relied on the material contained in the affidavits to determine that Father was an unfit parent. None of the district court's findings mention the challenged affidavits. Even though the exhibits were improperly admitted into evidence, we will reverse only if the

16

erroneous admission of the evidence was likely to alter the outcome of the proceedings. See *In re J.R.*, No. 104,975, 2011 WL 2175953, at *5 (Kan. App. 2011) (unpublished opinion).

Because there was no basis for the factfinder to consider these affidavits in resolving this case, we disregard them in our consideration of the claim that the evidence was insufficient to support the district court's findings of unfitness.

*Sufficiency of the Evidence*

Mother and Father argue that there was insufficient evidence to support the district court's finding that they were unfit parents. They do not argue that if unfitness is substantiated, the district court erred in finding that their unfitness was unlikely to change in the foreseeable future. Nor do they challenge the district court's finding that termination is in the best interests of the children. Issues not briefed are deemed waived and abandoned. See *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). Thus, we confine our review to the district court's finding of unfitness.

The parents note that the district court's findings centered on the ongoing domestic abuse between them. They emphasize the fact that their children were taken into State custody directly from the hospital where they were born and the children have never been in the custody of their parents. Thus, the parents argue, whether the children will be harmed if they have the opportunity to live with their parents is pure speculation, which is insufficient to support the termination of their parental rights.

This argument was addressed in *In re Price*, 7 Kan. App. 2d 477, 644 P.2d 467 (1982), a case with facts similar to those now before us. There, "[t]he principal question presented is whether a parent may have his or her parental rights severed when the parent has never had custody of the child." 7 Kan. App. 2d at 477. Our court answered this

17

question in the affirmative, citing appellate decisions in Washington, Colorado, Ohio, Iowa, and North Dakota. For example, in *In Interest of Kester*, 228 N.W.2d 107, 110-11 (Iowa 1975), a termination of parental rights case, the Iowa Supreme Court noted: "The termination statute is preventative as well as remedial. The statute mandates action to prevent the probable harm to children and does not require delay until after the harm has been done . . . we cannot gamble with the children's future. They must not be made to await their mother's maturity."

The Revised Code for Care of Children, K.S.A. 2015 Supp. 38-2201 *et seq.*, permits the court to terminate parental rights when a child has been adjudicated a child in need of care and "the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2015 Supp. 38-2269(a); see *In re K.W.*, 45 Kan. App. 2d 353, 246 P.3d 1021 (2011). The Code lists a number of nonexclusive factors the district court must consider in determining a parent's unfitness. See K.S.A. 2015 Supp. 38-2269(b) and (c). Any one of the factors may, but does not necessarily, establish grounds for terminating a parent's rights. K.S.A. 2015 Supp. 38-2269(f). The district court is not limited only to the statutory factors in making a determination of unfitness. K.S.A. 2015 Supp. 38-2269(b).

When determining whether factual findings are supported by clear and convincing evidence, we do not weigh conflicting evidence, pass on the witnesses' credibility, or redetermine questions of fact. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010). Clear and convincing evidence requires the factfinder to believe "that the truth of the facts asserted is highly probable." *In re B.D.-Y.*, 286 Kan. 686, 697, 187 P.3d 594 (2008).

Here, the State admitted a multitude of exhibits supporting its case for termination of parental rights, including affidavits, mental health reports, counselling reports, reports

18

from case managers and other professionals, photographs of injuries, copies of text messages, and a video. The district court listed the exhibits it relied on in its journal entry supporting termination. But the parents have not included these exhibits in the record on appeal. Nevertheless, after reviewing the extensive transcripts included in the record on appeal spanning over 7 days of testimony, including testimony from the authors of the various reports not included in the record, we have sufficient evidence before us for a thorough consideration of the sufficiency of the evidence of unfitness.

The parents argue that domestic abuse, without more, is insufficient to support a termination of parental rights. In *In re A.H.*, 50 Kan. App. 2d 945, 949, 334 P.3d 339 (2014), a panel of this court found a CINC determination to be appropriate for a 5-month-old infant for whom there was little, if any, evidence of abuse. There was no evidence that the infant had been exposed to the abuse. But the district court concluded that the CINC adjudication was appropriate when there was evidence of continued domestic abuse in the home and at least one of the children in the home actually witnessed the abuse. 50 Kan. App. 2d at 946.

The parents point to *In re D.M.*, No. 112,445, 2015 WL 2414508, at *7 (Kan. App. 2015) (unpublished opinion), in which a panel of this court found the district court's termination improper where there was no evidence that the children were ever actually abused, no evidence that mother's boyfriend had been physically abusive to mother, and no evidence that any domestic abuse occurred in the presence of the children. The panel noted that if the record had contained direct evidence that the boyfriend had been actually abusive to Mother or the children, the district court's termination of rights would have been upheld. 2015 WL 2414508, at *7.

Here, we find ample evidence of Father's physical and emotion abuse of Mother and Mother's inability or unwillingness over an extended period of time to remove herself from the situation. Many witnesses corroborated a pattern of abuse and a concern that

Mother and Father had been unable to break the pattern of abusive behavior and would be unable to break that pattern if the children were placed in their custody.

*Mother*

In the context of the various statutory bases for determining parental unfitness, we first examine the evidence the district court used to support its conclusion that Mother was unfit.

- *K.S.A. 2015 Supp. 38-2269(b)(1)—emotional illness, mental illness, mental deficiency, or physical disability of such duration or nature as to render her unable to care for the ongoing physical, mental, or emotional needs of her child*

The record contains conflicting evidence of Mother's mental illness, a diagnosis of borderline personality disorder, and its effect on her ability to care for the ongoing physical, mental, or emotional needs of the children. But as Dr. Dickerson testified, given the events since Dickerson's initial evaluation of Mother, he is "moving toward a rule in rather than a rule out of borderline personality disorder."

The district court pointed to the fact that Mother was codependent on Father and "thrives on perpetual drama, chaos, and conflict." The court found that Mother is unable to provide a safe and secure home environment and protect the children from exposure to Father because she cannot permanently separate from Father. The district court relied on text messages and emails that Mother sent to several of the witnesses as evidence of Mother's mental instability, irrational thinking, and erratic behavior.

Several professionals testified as to Mother's pattern of instability and her inability to separate from Father. Because of her codependent relationship with Father, Mother is

20

unable to place the needs of her children above her own needs. Although there is no clear consensus of a diagnosis, there is sufficient evidence that Mother's condition rendered her unable to meet the mental or emotional needs of the children.

- *K.S.A. 2015 Supp. 38-2269(b)(4)—physically, mentally, or emotionally abused or neglected a child or sexually abused a child*

In support of this finding, the district court pointed to the fact that Mother has chosen to remain in an abusive, codependent relationship with Father and therefore has sacrificed her children's physical, mental, and emotional well-being. While there is no evidence that Mother physically, mentally, emotionally, or sexually abused the children, her unwillingness to separate from Father kept her from the essential day-to-day emotional connection she otherwise would have had, and the emotional nurturing she could have provided, if the children had been in her custody. To this extent, Mother's conduct resulted in emotional neglect of the children.

- *K.S.A. 2015 Supp. 38-2269(b)(7)—inability to rehabilitate the family despite the reasonable efforts provided by DCF and other appropriate public or private child caring agencies, as evidenced by case supervision, treatment assistance, and counselling, as well as providing for the care of the child and facility assistance for the mother*

The district court noted that social workers, program support workers, and other professionals provided services to the parents in order to assist them in complying with case plans and court orders. Despite these efforts, the court found the parents had managed only surface changes, never having successfully addressed "anger management, codependency, and abusive behavior." As Dr. Turner testified, Mother would change her story "from one week to the next," which made it impossible to make any progress. The extensive albeit unsuccessful efforts to rehabilitate Mother through counselling,

21

educational classes, and treatment assistance are well-documented in the record and support the district court's finding.

- *K.S.A. 2015 Supp. 38-2269(b)(8)—lack of effort to adjust her circumstances, conduct, or condition to meet the needs of the children*

The district court stated that the couple shared a volatile and unhealthy relationship filled with domestic violence. The parents acknowledge that the heat of anger creates problems in their relationship, but they deny there are problems once the anger has passed. The court found that any changes they made were "purely transient and cosmetic" and the parents soon returned to their dysfunctional, unhealthy status. The district court cited extensive evidence of the parents' toxic relationship that included verbal and physical abuse. Mother had a pattern of leaving Father only to return, indicating a lack of effort to adjust her circumstances to meet the needs of the children. She placed a higher value on remaining in the abusive relationship with Father than placing herself in the position to gain the custody of her children.

The district court's findings are supported by the testimony of various professionals involved in treating Mother and Father.

- *K.S.A. 2015 Supp. 38-2269(c)(1)—failure to assure care of the child in the parental home*

To support this factor, the district court relied on Mother's decision to remain in an abusive, codependent relationship with Father no matter how detrimental this would be to her children's mental, physical, and emotional health.

The evidence in the record supports the district court's finding that Mother chose to remain in the abusive relationship with Father rather than place herself in the position to gain the custody of her children.

*Father*

Next, we examine the evidence the district court used to support its conclusion that Father was unfit.

- *K.S.A. 2015 Supp. 38-2269(b)(1)—emotional illness, mental illness, mental deficiency, or physical disability of such duration or nature as to render him unable to care for the ongoing physical, mental, or emotional needs of his child*

Father has an explosive temper and is physically, verbally, and emotionally abusive to Mother. Because of this abuse, Father cannot provide the children a safe, secure, nurturing home environment. The evidence suggests intermittent explosive disorder and antisocial personality disorder because Father has not shown that he can handle parenting or integrating the children into the family. Dr. Dickerson testified he would consider ruling in intermittent explosive disorder and antisocial personality disorder on a showing of multiple instances of explosive outbursts leading to Mother filing PFA actions and Father's physical and verbal abuse of Mother. The filing of those PFA actions and Father's physical and verbal abuse are well-documented in the record.

Several professionals testified regarding Father's history of violence and abuse. Although there was no clear consensus of a diagnosis, there is sufficient evidence that Father's condition rendered him unable to meet the mental or emotional needs of the children.

- *K.S.A. 2015 Supp. 38-2269(b)(7)—inability to rehabilitate the family despite the reasonable efforts provided by DCF and other appropriate public or private child caring agencies, as evidenced by case supervision, treatment assistance, and counselling, as well as providing for the care of the child and facility assistance for the father*

The district court found that despite reasonable efforts by DCF and other agencies over a period of 3 years—as evidenced by case supervision, treatment assistance, and counseling—Father has not achieved rehabilitation despite his participation in various programs. Father continues to have problems with anger management, codependency, and abusive behavior. As case manager Horn testified, this case has been pending for an extended period of time and there has been no change in the cycle of violence involving the parents.

The extensive but unsuccessful efforts to rehabilitate Father through counselling, educational classes, and treatment assistance are well-documented in the record and support the court's finding.

- *K.S.A. 2015 Supp. 38-2269(b)(8)—lack of effort to adjust his circumstances, conduct, or condition to meet the needs of the children*

The district court stated that the couple shared a volatile and unhealthy relationship filled with domestic violence. The parents acknowledge the problems that arose in their relationship in the heat of anger, but they deny that they have problems once the anger has passed. It is clear that any changes they made in their relationship were "purely transient and cosmetic," and the parents soon returned to their dysfunctional, unhealthy status. The district court pointed to extensive evidence in the record of the parents' toxic relationship, including evidence of verbal and physical abuse. When Mother would return to Father, she would invariably leave again due to Father's

24

unwillingness or inability to change. Without change, there was no way for Father to create a safe environment that would meet the emotional needs of his children.

The district court's findings are supported by the testimony of various professionals involved in treating Mother and Father.

CONCLUSION

The parents do not contend that if unfitness is substantiated, the district court erred in finding that their unfitness was unlikely to change in the foreseeable future. Nor do they challenge the district court's finding that termination is in the best interests of the children. With respect to the remaining factors the district court relied upon, when we view the evidence in the light favoring the State we find clear and convincing evidence to support the district court's conclusion that the parents are unfit.

We find clear and convincing evidence to support the district court's findings that Mother is unfit under K.S.A. 2015 Supp. 38-2269(b)(1), (b)(4), (b)(7), (b)(8), and (c)(1). We also find clear and convincing evidence to support the district court's finding that Father is unfit under K.S.A. 2015 Supp. 38-2269(b)(1), (b)(7), and (b)(8).

Affirmed.